## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JOEL STILL, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 07-5235 |
| | : | |
| CUMMINS POWER SYSTEM, WILLIAM | : | |
| ROBINSON, and JOHN CASEY, | : | |
| Defendants. | : | |

## Memorandum and Order

YOHN, J.                                                                                          January 8, 2009

Joel Still brings this employment discrimination and retaliation suit against Cummins

Power Systems, Inc.[1] ("Cummins") as well as Cummins employees William Robinson and John

Casey under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*, and

the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq*.  Defendants

move for summary judgment on all counts pursuant to Rule 56 of the Federal Rules of Civil

Procedure.  For the reasons discussed herein, the court will grant in part and deny in part

defendants' motion.

### I.      Factual Background[2]

---

[1] In the caption of his complaint, plaintiff referred to Cummins as "Cummins Power System."  (Compl. at 1) (capitalization omitted).  In the body of the complaint, however, plaintiff referred to Cummins as "Cummins Power Systems, Incorporated."  (Compl. ¶ 4) (capitalization omitted).  According to defendants, Cummins is correctly identified as "Cummins Power Systems, Inc." (Answer at 1.)

[2] Except where otherwise noted, the account contained in this section is comprised of undisputed facts and Still's factual allegations.  For the present motion, the court views all facts and justifiable inferences in the light most favorable to Still, the nonmoving party.  *See, e.g.*,

1

A.      Still's Job History at Cummins

Defendant Cummins is a corporation organized under Pennsylvania law with its headquarters in Bristol, Pennsylvania.  (Compl. ¶ 4 at p. 2³; Def.'s Statement of Material Undisputed Facts ("Def.'s Statement") ¶ 1.)  Cummins is "in the business of distribution, sale[,] and servicing of engines and power units."  (Def.'s Statement ¶ 1.)  Plaintiff Joel Still is an African-American male.  (Compl. ¶ 3 at p. 2.)  From December 1995 through November 10, 2006, Cummins employed Still.  (*Id.* ¶ 3.)  Still began his employment at Cummins as a mechanic and rose through promotion ultimately to the position of Service Manager at Cummins's Bristol location.  (*Id.*)  Cummins terminated Still's employment on November 10, 2006; at that time, out of approximately fifteen managers at the Bristol facility, Still was the only African-American manager.  (Compl. ¶¶ 3-4.)

William Robinson and John Casey are white, male Cummins employees.  (Compl. ¶¶ 5, 7 at p. 2.)  At the times relevant to this case, Robinson was Operations Manager at the Cummins Bristol facility.  (Decl. of William E. Robinson ["Robinson Decl."] ¶ 2, Aug. 22, 2008.)  In April 2004, Robinson promoted Still to the position of Service Manager for Cummins's Engines Services Department, the last position that Still held at Cummins.  (Pl.'s Dep. 38:18-39:8, May 30, 2008; Robinson Decl. ¶ 4.)  When Still became a service manager, Robinson became Still's

*Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 192 (3d Cir. 2008).

³ The first eleven paragraphs in plaintiff's complaint are numbered 1through 11.  After paragraph 11, the numbering restarts, and the remaining paragraphs of the complaint are numbered 1 through 58.  Defendants have numbered the paragraphs in their Answer to mirror the two numerical series found in the complaint.  For clarity, the court notes that the "¶ 4" associated with this footnote appears on the second page of the complaint, as part of the first numbered series.  Unless otherwise noted by page number designation, in this memorandum all other citations to the pleadings will refer to the second series of numbered paragraphs.

direct supervisor.  (Robinson Decl. ¶ 5.)  At the times relevant to this case, Casey was Director of Operations for Cummins, overseeing three Cummins service locations, including the Bristol facility.  (Decl. of John Casey ("Casey Decl.") ¶ 2-3, August 22, 2008.)  In that capacity, Casey supervised Robinson.  (Compl. ¶ 6; Answer ¶ 6.)

Once Still became a service manager, defendants claim that Still's salary was higher than any of the other service managers at the Bristol facility.  (Def.'s Statement ¶ 5.)  Still asserts that he does not know the salaries of the other service managers and, therefore, cannot comment on their relative earnings.  (Pl.'s Resp. Opp'n Def.'s Statement Undisputed Facts ["Pl.'s Resp."] ¶ 5.)  As a service manager, Still was involved with, *inter alia*, running the shop, calling customers, warranty claim work, job quotes, and credit issues.  (Pl.'s Dep. 42:12-43:15; Def.'s Statement ¶ 6; Pl.'s Resp. ¶ 6.)

After Still became a service manager, he had attendance problems at Cummins.  (Pl.'s Dep. 102:23-103:1.)  The parties, however, disagree as to the severity of these problems.  Still admits that his attendance "was not the best" (Pl.'s Resp. ¶ 10) and agrees that his "attendance wasn't very good" (Pl.'s Dep. 102:23-103:1).  Defendants point to a log that Robinson kept of Still's attendance for the period of December 6, 2004 through November 9, 2006.  This log contains entries for at least fifty-nine instances of lateness, early departures, extended lunches, and other attendance problems during the approximately twenty-three month period for which the log was kept.  (Robinson Decl. Ex. A.)  Still has not submitted any evidence to contradict the entries in this log.  Rather, he disputes defendants' characterization that he was "frequently" late.

(Pl.'s Dep. 103:5-7.)[4]

Defendants have submitted to the court Still's annual employee performance reviews for 2004, 2005, and 2006. (Robinson Decl. Ex. C-E.) As Still's supervisor, Robinson completed all three reports. Robinson and Still both signed the reports. On the 2004 review, Still earned a "5" (on a scale running from 1 to 10) for "punctuality and attendance." (Robinson Decl. Ex. C.) The form explanation associated with a rating of "5" reads "[n]ormal attendance, occasionally lacks legitimate reasons, average loss of time on job." Robinson commented on the 2004 report that Still had been a service manager for only two months at the time the report was completed, so "[a]ny evaluation of his performance, at this point, would be incomplete." (Robinson Decl. Ex. C.) Robinson did, however, write the following comments regarding Still's job performance on the 2004 report: "Extremely knowledgeable on the Cummins products. Very helpful to customers. Needs more experence [sic] as a service manager." (*Id.*)

On both the 2005 and 2006 performance reviews, Still received a "1" (the lowest possible rating) for "punctuality and attendance." (Robinson Decl. Ex. D-E.) The form explanation associated with a rating of "1" reads "[f]requent absence or tardiness, requires close supervision

---

[4] The log itself contains a number of excuses that, according to defendants, Still proffered for his late arrivals, early departures, and extended lunches. Still has not submitted any evidence to contradict the log entries. A sampling of these alleged incidents includes: (1) multiple instances of leaving work for late-morning medical appointments but not returning to work later in the day; (2) arriving late, citing traffic problems, when other employees did not experience traffic problems on the same roads; (3) repeatedly arriving late or leaving early, claiming sickness or tooth pain; (4) arriving late, after an alleged dental appointment, with a bag from Tony Luke's in South Philadelphia; (5) arriving nearly three hours late because of a meeting with a landscaper; (6) arriving three hours late because Still was having a fence installed; (7) arriving late because of oversleeping; (8) arriving late because of vehicle trouble; (9) arriving late, claiming to have trouble getting up in the morning; and (10) failing to attend a company meeting in Annapolis, claiming that his truck broke down en route to the meeting but refusing offers to be picked up and brought to the meeting by other Cummins personnel.

on job to avoid lost time." (*Id.*)  Robinson made comments on both the 2005 and 2006 reports indicating that Still needed to increase the sales or profits of his department.  (*Id.*)

By April 2005, defendants claim that Casey and Jay White, who at the time was Vice President of Operations for Cummins, decided to fire Still because of his attendance problems. (Robinson Decl. ¶ 10-11.)  Defendants further claim that Robinson persuaded Casey and White to place Still on probation instead.  (*Id.* 11-12.)  Still denies these claims, asserting he has no knowledge of meetings between Casey, White, and Robinson.  (Pl.'s Resp. ¶ 21.)

Still admits that Robinson spoke with him several times regarding his attendance at work. (Pl.'s Dep. 104:4-9.)  Defendants claim that, on April 29, 2005, Still met with Robinson and Casey.  (Robinson Decl. Ex. B.)  Robinson and Casey informed Still that he was being placed on probation.  (Pl.'s Dep. 104:10-12; Def.'s Statement ¶ 23.)  At this meeting, Still signed a document entitled "Warning/Corrective Action Notice," ("Notice") which explained that he was being put on probation due to attendance problems and unsatisfactory job performance.[5] (Robinson Decl. Ex. B.)  Under the terms of the Notice, Still was placed on probation for ninety days.  His interim performance was to be evaluated after thirty and sixty days.  (*Id.*)  The Notice stated that the probationary period was Still's "LAST CHANCE," and that his future employment with Cummins depended on improvement of his attendance and job performance.

_____

[5] The Notice highlights several performance issues related to Still's work including: (1) missing "excessive work time"; (2) failure "to promptly complete assigned duties, including but not limited to [failure] to promptly handle cash sales and credit and billing issues, return customers [sic] phone calls, respond to policy requests, complete time sensitive employee benefit forms, complete required documentation on employee disciplinary action, complete requests for shop tools and/or supplies, and respond to morale problems with the technicians"; (3) failure to "seek or to obtain the necessary training for [himself] and [his] management team"; (4) treating his "management team with disrespect"; and (5) not conducting himself "in a mature and professional manner, as required by [his] position in the organization."  (Robinson Decl. Ex. B.)

(*Id.*) (capitalization in original).

Defendants contend that, "after a period of improvement following [his] probation," Still again had attendance problems.  (Def.'s Statement ¶ 28.)  Still agrees that he "was talked to about" his attendance after his probation but testified that he lacked sufficient memory to comment on the accuracy of Cummins's characterization of his post-probation attendance.  (Pl.'s Dep. 180:23-181:19.)  In approximately October 2006, Still told Robinson that Still "didn't like coming to work" and that he was "sick of the job."  (*Id.* 171:6-172:3.)

Still testified that around the same time—October 2006—he began receiving work assignments for which he had not been trained and that he did not know how to complete.  (Pl.'s Dep. 134:16-137:23.)  Although Still could not recall the details of these assignments, he stated that they related to the preparation of revenue or productivity reports for his department.  (*Id.* 135:5-9.)  Still informed Robinson and Casey that he did not know how to complete these assignments.  (*Id.* 136:22-137:4.)  According to Still, Robinson and Casey told Still that another Cummins employee, Joe Kelly, "learned to do things on his own" and directed Still to seek help within the company.  (*Id.* 137:5-10.)  Still unsuccessfully sought instruction from Kelly.  (*Id.* 37:1-2; 137:11-19.)  Regarding these work assignments, Still testified as follows: "I tried to do the best I could do and then what I couldn't do, I didn't do."  (*Id.* 137:18-19.)  Still also testified that he "got in trouble for not getting [the assignments] done."  (*Id.* 137:21-23.)  Still further asserted that he had trouble with some of his duties due to lack of training, testifying as follows:

> I just didn't know the computer as well, I didn't know how to do the progress reports with the reporting system as well to do my job with reports.  You had had to read the reports correctly, and I was trained two days by Joe Collins [(another Cummins employee)] before he left to go to Baltimore.

(*Id.* 109:15-20.)

On November 8, 2006, Still sent an e-mail to Robinson explaining that he might need to leave work early that day for a medical appointment.  The following exchange of e-mails took place:[6]

Still's Initial E-mail to Robinson:

Bill [(Robinson)] I have to try and make a appointment , I been sick for 2 weeks and it seems to come and go , I came in at 10am this morning , I knew Mike was out , But I calling today to see when I can see the doctor

I'm trying to make a night appointment but at this point I'm going to have to take what they have.

Robinson's Reply to Still:

Why didn't you leave a message on my voice mail this morning telling me you would be late?  You also left early last Wednesday without notifying me.
Why?

We have had many discussions on this and you know you are suppose to contact me or leave me a message.  What is the problem?

Still's Reply to Robinson:

I leave early every Wed.  Last Wed was Halloween[7] I left 5 min early trying to get a jump on traffic to get my daughter.  I would have told you but you was not here,[8] Really didn't think it was a big deal obviously I was wrong again.  You know I get reprimanded every time I'm late or anything but nothing is never said when I'm here late or on Sat. working.

_____

[6] The e-mails contain numerous errors of grammar and punctuation, which the court has reproduced to ensure accuracy.

[7] As defendants point out, the "last Wednesday" to which Still refers would have been November 1, 2006, not Halloween.

[8] Robinson claims that he was at the Bristol facility on the day in question and that Still waved to Robinson as Still left.  (Robinson Decl. Ex. A.)

7

As for today I was sick  I have been sick and into work everyday on time  I called Chuck This morning and asked him to tell you.  I don't have a problem  The only problem I have is that it seems like nothing is never good enough for you no matter what I do,  So with that being said I will decide what I'm going to do or you can make the decision your self, because it seems to me that you don't want me here any way.

(Def.'s Statement Ex. 3.)

On November 10, 2006, Still's employment at Cummins was terminated; Still testified that he was forced to resign.  (Pl.'s Dep. 106:6-8.)

### B.       Allegations of Racial Discrimination

Still testified that Robinson discriminated against him in two ways: (1) by playing racially offensive audio clips and (2) by reprimanding Still for his attendance but not reprimanding another employee, Joe Collins, for arriving late.[9]  (*Id.* 178:2-18.)  Still also attributed the low marks on his performance reviews to Robinson.  (*Id.* 107:11-109:11.)[10]

#### 1.       Audio Clips

During at least part of the period in which Still worked as service manager, Robinson would use the computer in his own office to play digital audio clips from movies at gatherings of managers, including Still.[11, 12]  (Robinson Decl. ¶¶ 17-23; Compl. ¶ 8-9.)  Still testified that he

_____

[9] Still did not testify as to Collins's race.  However, for purposes of the present motion, the court infers that Collins is white because Still pleaded that "[s]imilarly situated white managers were not similarly reprimanded when they arrived late to work."  (Compl. ¶ 17.)

[10] Still pleaded that the size of his 2006 raise was the result of discrimination.  (Compl. ¶ 23.)  At his deposition, however, Still did not assert that his 2006 raise—which was apparently $15 per biweekly pay period—constituted one of the ways in which Robinson discriminated against him.  Defendants assert that Still received a relatively small raise in 2006 because of his attendance problems.  (Casey Decl. ¶ 28.)

[11] Still did not submit evidence regarding the precise time period during which these audio clips were played.  He alleges that Robinson began playing the clips at gatherings of

found at least two of these clips racially offensive. (Pl.'s Dep. 129:17-20.) Those two audio clips, excerpted from the movies *Pulp Fiction* and *Training Day*, contained the "N-word."[13] (Pl.'s Dep. 128:5-130:20.)

The clip from *Pulp Fiction* was a "colloquy between two characters, Jimmie Dimmick (played by Quentin Tarantino ['QT']) and Jules Winnfield (played by Samuel Jackson ['SJ']), concerning the disposal of the corpse of an African-American . . . . Jimmie wants to help Jules dispose of the body but fears his wife's reaction." (Robinson Decl. at 6.) The clip from *Pulp Fiction* encompassed the following dialog:[14]

> QT:   When you came pullin' in here, did you notice a sign on the front of my house that said "dead nigger storage?"
> SJ:    Jimmy, you know I ain't seen no . . .
> QT:   Did you notice a sign in the front of my house that said "dead nigger storage?"
> SJ:    No. I didn't.
> QT:   Do you know [sic] you didn't see that sign?
> SJ:    Why?
> QT:   'Cause it ain't there, 'cause storin' dead niggers ain't my fuckin' business, that's why!

---

managers "[i]n or about November 2005." (Compl. ¶ 8.)

[12] Still testified that he himself would e-mail jokes, audio clips, or video clips to other Cummins employees. (Pl.'s Dep. 66:13-67:3.) The parties, however, disagree as to whether Still ever e-mailed a series of images entitled "Prom Night in the Ghetto" to Robinson.

[13] The court recognizes the loathsome and deplorable history of the word "nigger." To provide a complete account of the facts in this case, I will use that word when quoting from materials submitted by the parties. Elsewhere in this memorandum, however, the word will be abbreviated appropriately.

[14] The court draws the text of the two movie excerpts included in this memorandum from the Declaration of William E. Robinson. The parties have not submitted the actual digital audio files to the court, and plaintiff does not dispute the accuracy of Robinson's quotations of the excerpts.

(Robinson Decl. at 6-7.)

The clip from *Training Day* was a "colloquy between the African-American lead actor, Denzel Washington ['DW'], who plays a veteran (and corrupt) narcotics officer, and his white trainee, [played by] Ethan Hawke ['EH']." (Robinson Decl. ¶ 20.) The clip from *Training Day* encompassed the following dialog:[15]

> DW: So, why'd you want to be a narc?
> EH: [chuckles] Uh. I want to make detective.
> DW: There you go. You can do it, stick with me, you can do it. Unlearn that bullshit they teach you at the Academy, though. Don't bring none of that shit in here. That shit'll get you killed out here.
> [brief pause]
> EH: I will do anything you want me to do.
> [pause]
> DW: My nigga. [laughs]

(*Id.*)

As already mentioned, Robinson would gather managers—including Still—in his office and play these and other audio clips on his computer. (Compl. ¶ 9; Robinson Decl. ¶¶ 17-26.) At these times, the managers would laugh at the clips, and Still felt offended. (Pl.'s Dep. 128:5-132:7.) Still testified that he would laugh along with the other managers "just to try to fit in," but that in reality Still did not find the clips funny. (*Id.* 85:2-7.) Moreover, Still testified that he believed he would lose his job if he were to complain about the clips. (*Id.* 85:5-7.) Still also testified that Robinson would play the clip from *Training Day* when Still was leaving the office such that "my nigga" could be heard when Still would pass through an office door. (*Id.* 129:1-5.)

---

[15] The indications of chuckles, laughs, and pauses denoted in the *Training Day* excerpt appeared in Robinson's undisputed account of this movie clip. The court has not altered the quotation.

Still lacked precision in his testimony as to the frequency with which Robinson played these clips.  Regarding the *Pulp Fiction* clip, Still testified that Robinson "[p]layed it a lot of times," (*Id.* 84:16), and that Still listened to it "[s]everal times" (*Id.* 85:20).  Regarding the *Training Day* clip, Still testified that Robinson

> would play that when I would be leaving the office sometimes—when I'd be leaving the office sometimes he would play that and it would go off "my nigger" when I was walking out the door.  And sometimes he would play it in front of us while all the other managers was in the office laughing about it.

(Id. 129:1-7.)[16]

Still testified that he believed Robinson played the clips to embarrass and harass him, asking why else Robinson would play the clips "in front of just one black person and a whole bunch of white people laughing about it[.]"  (*Id.* 131:3-8.)  Still never complained to Robinson about the clips,[17] a fact that he attributes to fear of retaliation.  (*Id.* 85:21-86:12.)  Still complained to Casey about Robinson, but in those complaints, Still did not refer to race or his feelings of racial discrimination.  (*Id.* 86:13-87:11.)  Rather, Still expressed to Casey that Still was displeased with the way Robinson treated Still and others and with the type of work Robinson assigned to Still.  (*Id.* 86:18-87:11.)  Most specifically, Still testified to the following:

---

[16] Still also testified that Robinson played many other clips and that not all of Robinson's clips were racially offensive.  Still could only remember the *Pulp Fiction* and *Training Day* clips as being racially offensive.  When asked about the racial offensiveness of all the clips Robinson played, Still responded that "[n]ot all of them, but a lot of them" were racially offensive.  Still then stated that the clips were played "constantly over and over," but it is unclear whether he was referring at that time to all the clips played or to only the racially offensive clips.  (Pl.'s Dep. 129:17-130:20.)

[17] Still does claim that the e-mail, reproduced above at pages 7-8, which he sent to Robinson a few days before Still's employment at Cummins was terminated, constituted a complaint about the clips.  As discussed below, however, the court finds that the e-mail makes no mention of the audio clips or race whatsoever.

Q:      So regarding Bill Robinson you complained to John Casey about him one time
         correct?
A:      Always complained to John Casey about Bill.
Q:      Okay.  But you never told John Casey that you thought Bill was discriminating
         against you on the basis of your race?
A:      No.
Q:      You never told anybody in Cummins management that you thought Bill was
         discriminating against you on the basis of your race, correct?
A:      Right.  I was scared of Bill, so I didn't say anything.
Q:      And isn't it true that you never complained to anybody in Cummins management
         that anybody else in Cummins management was discriminating against you on the
         basis of your race, correct?
A:      Correct.

(*Id.* 96:9-97:3.)

## 2.      Treatment of Employees by Robinson

As mentioned, Still testified that Robinson discriminated against him by reprimanding

Still for his attendance problems but not similarly reprimanding Joe Collins when Collins arrived

late.  (*Id.* 178:2-18.)  Still also testified that many Cummins employees had problems with

Robinson as a boss.  (*Id.* 58: 8-59:11.)  Specifically, Still testified that "nobody liked Bill

Robinson for some reason . . . because he would fire people, because he thought people was [sic]

up to other things, but this is what I dealt with every day trying to do my job and get along with

everybody in the shop."  (*Id.* 58:11-16.)  Still also testified that "I don't know anybody in here [at

Cummins] who hasn't had a problem with Bill at certain times in their employment here.  That's

Bill."  (*Id.* 61:23-62:2.)  Still characterized Robinson as "very loud and boisterous."  (*Id.* 62:12-

13.)  According to Still, three former Cummins employees left their jobs because of trouble with

Robinson: Chris Wiley, Rich Hoster, and Joe Kelly.  (*Id.* 59:21-22, 60:7-14.)  Wiley and Hoster

are white.  (*Id.* 64:5-7.)  Still did not testify as to Kelly's race.

Still also testified that two employees who complained about the way Robinson treated

them were disciplined in retaliation: Mike Erbe and Alex Nunez.[18, 19]  (*Id.* 120:18-121:1, 124:18-24.)  According to Still, Erbe complained to Still about Robinson; Still passed along Erbe's complaints to Robinson.  (*Id.* 121:1-24.)  Still claims that Robinson then began to "holler[]" at Erbe more frequently than he had in the past.  (*Id.* 122:21-123:4.)  Still testified that Nunez complained to another Cummins employee about Robinson and was subsequently fired for allegedly falsifying expense reports.  (*Id.* 125:4-126:8.)

### 3. Other Incidents Touching on Race

Still pleaded and testified to two other incidents at Cummins involving race: a comment by then-Vice President of Operations Jay White and an exchange between Still and Cummins President Richard Pate.  Still testified that after he was put on probation, White asked to speak with him and told Still that "it [was] going to be twice as hard for [Still] because [he is] black to get through this."  (*Id.* 94:1-95:24.)  Still could not recall other details to provide further context for this alleged comment.  White asserts that while he did have a conversation with Still after Still was put on probation, he made no comments about race.  (Second Decl. of Jay T. White ¶ 6, Sept. 12, 2008.)  White further asserts that, when Still was promoted to service manager, the two men "had a brief conversation in which [White] surmised that generally it might be harder for [Still] as a black man in a management role relative to managing a largely white group of employees."  (*Id.* ¶ 4.)  White claims he offered Still "whatever support he needed."  (*Id.*)

---

[18] In his deposition, Still grouped Joe Kelly with Erbe and Nunez, but Still did not specify in what way Robinson allegedly retaliated against Kelly.

[19] Still testified that Erbe is white.  (Pl.'s Dep. 124: 16-17.)  He did not testify as to Nunez's race, but defendants identified Nunez as Hispanic.  (Def.'s Mem. Law Supp. Def.'s Mot. Summ. J. at 11.)

Additionally, Still testified to an exchange with Cummins President Richard Pate in which Pate allegedly asked Still to send him a list of "black slang words" that Pate could use when speaking to black business associates.  (Pl.'s Dep. 97:5-23.)  Still complied with this request by sending an e-mail containing slang words to Pate.  (*Id.* 100:19-101:4.)  Still characterized Pate's request as "strange," and testified that he complied with it because of Pate's position at Cummins.  (*Id.* 101:24-102:13.)  Still "told" Robinson and Casey about Pate's request but did not "complain" to them about it.  (*Id.* 101:5-11.)

### 4.      Cummins's Policy against Harassment

In the course of his employment at Cummins, Still acknowledged that he received a copy of Cummins's "No Harassment Policy" on November 18, 1998.  (Decl. of Jay T. White ["First White Decl."] Ex. G, Aug. 22, 2008.)[20]  The parties agree that Cummins published an "Employee Handbook" and that Still received a copy of this handbook when he began his employment with Cummins and also received two updated versions of the handbook during his employment.  (Pl.'s Dep. 77:9-78:20; Decl. of Kathleen C. Hopkins ["Hopkins Decl."] ¶¶ 5-6, Sept. 12, 2008.)  The Employee Handbook includes a section on harassment in the workplace that discusses both "informal" and "formal" resolution procedures.  (First White Decl. Ex. H. at VIII-7-8.)  Employees are instructed to report harassment (or file a formal complaint of harassment) to the Operations Manager.  (*Id.*)  Further, the Employee Handbook states that:

[i]f an employee is uncomfortable brining [sic] a complaint to the attention of the

---

[20] Still signed a form acknowledging receipt of the No Harassment Policy.  This form also states that Still acknowledged attending a Cummins presentation in which it was explained that employees should report harassment to their supervisors or other Cummins managers.  (First White Decl. Ex. G.)

Operation [sic] Manager or the complaint/observation of harassment involves someone in the employee's direct line of command, then the employee should contact any individual who is listed in the *Who to Contact Directory* section of the handbook.

(*Id.* at VIII-8.) (emphasis in original).[21]

### C.   Administrative Procedural History

Plaintiff filed racial discrimination charges against defendants with the Equal Employment Opportunity Commission (EEOC) on January 29, 2007. (Compl. ¶ 1; Answer ¶ 1.) Plaintiff received a Notice of Right to Sue Within 90 Days on October 19, 2007. (Compl. ¶ 2; Answer ¶ 2.) Plaintiff elected to dual-file his charges with the Pennsylvania Human Relations Commission (PHRC) via the EEOC. (Def.'s Statement Ex. 4.) Accordingly, plaintiff is treated as having filed his charges with the PHRC on January 29, 2007.

## II.   Discussion

### A.   Standard of Review

A motion for summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party thus bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the

---

[21] The parties have not submitted a copy of the *Who to Contact Directory* to the court. The court infers from defendants' assertions, however, that the *Who to Contact Directory* directs employees to contact "four different Human Resources employees, in addition to five member [sic] of [Cummins's] senior management team" if alleged harassment involves the Operations Manager. (First White Decl. ¶ 13; Hopkins Decl. ¶ 8.) Plaintiff does not dispute these assertions.

nonmoving party avoids summary judgment by presenting "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585 n.10 (1986) (quoting Fed. R. Civ. P. 56(e)).

Where the nonmoving party bears the burden of persuasion at trial, it meets its burden at the summary judgment stage by supporting each essential element of its claim with concrete evidence "from which a rational person could conclude that [its] position . . . on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.* 90 F.3d 737, 743 (3d Cir. 1996) (quotation marks and citations omitted); *see also Celotex*, 477 U.S. at 322-23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. Furthermore, "all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (quotation marks and citations omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

**B.     Testimony of Interested Witnesses**

Before addressing plaintiff's substantive claims, the court must address a legal argument advanced by plaintiff. Plaintiff argues that, in considering this motion for summary judgment, the court must disregard evidence from interested witnesses. (Pl.'s Resp. Opp'n Def.'s Mot. Dismiss at 5-6.) In so arguing, plaintiff relies on a misreading of *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). Explaining that a court considering a summary judgment motion "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence," the Court also stated that "in entertaining a motion for judgment as a matter of law, the court should review *all of the evidence in the record*." *Reeves*, 530 U.S. at 150 (emphasis added). More specifically, regarding the use of testimony from defendant-witnesses, the Third Circuit has held that "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible *even if the testimony is that of an interested witness*." *Lauren W. v. Deflaminis*, 480 F.3d 259, 272 (3d Cir. 2007) (emphasis added). To do otherwise would be "contrary to all precedent" and "would allow the non-moving party to defeat the motion with mere allegations." *Id.* at 272 n.13.[22] The Third Circuit also stated:

> We cannot believe that the law precludes a party from presenting his own testimony

---

[22] By way of example, the Third Circuit explained the following in a footnote:
For example in a controlled intersection traffic accident case if the moving party on a motion for summary judgment presents his deposition testimony that the light was green for him and red for the other party and there is no contrary evidence, and there is nothing implausible about the deposition, in considering the motion the court should accept the deposition testimony as true. If it does not do so then, contrary to all precedent, it would allow the non-moving party to defeat the motion with mere allegations.
*Id.* at 272 n.13.

on a summary judgment motion which, of course, is not to say that when there is
conflicting testimony the court may accept the testimony of one witness, even if a
party, rather than another.

*Id.* at 271.  Thus, in accordance with precedent, the court may consider the testimony of

interested witnesses where such testimony is uncontradicted.

      **C.**    **PHRA Claims**

      In Counts IV and V (misnumbered as Count VII) of his complaint, plaintiff seeks relief

under the PHRA provisions codified as 43 Pa. Cons. Stat. §§ 955(a) and (d), respectively.

(Compl. ¶¶ 51-58.)  Defendants point out that plaintiff instituted the present litigation within the

PHRC's one-year period of exclusive jurisdiction mandated by 43 Pa. Cons. Stat. § 962(c)(1).

(Def.'s Mem. Law Supp. Def.'s Mot. Summ. J. at 17.)  Thus, defendants argue, plaintiff has

failed to exhaust his administrative remedies regarding his Pennsylvania law claims.  (*Id.*)

Plaintiff agrees that his state law claims are untimely due to his failure to exhaust administrative

remedies and seeks to withdraw his claims in Counts IV and V (misnumbered as Count VII).

(Pl.'s Resp. Opp'n Def.'s Mot. Dismiss at 18-19.)  Pursuant to Federal Rule of Civil Procedure

41(a)(2), the court will dismiss Counts IV and V (misnumbered as Count VII).

      **D.**    **Title VII Claims**

          **1.**    **Individual Defendants**

      Because the PHRA claims are dismissed, all of plaintiff's remaining claims (those in

Counts I-III) arise under Title VII.  Title VII imposes liability on employers, but not on individual

employees.  *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996) (en

banc) (holding "Congress did not intend to hold individual employees liable under Title VII");

*see, e.g.*, *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 183-84 (3d Cir. 1997) (affirming

18

dismissal of Title VII claims against individual defendants).  Thus, individual defendants

Robinson and Casey cannot be held liable for any of the remaining claims in plaintiff's

complaint.  Accordingly, the court will grant defendants' motion for summary judgment as to

defendants Robinson and Casey.

### 2.    Count I

Plaintiff's complaint includes three counts involving Title VII, but the parties' subsequent

submissions to the court focus on only two claims: hostile work environment/racial harassment

and retaliation.  Count III clearly corresponds to the retaliation claim.  Counts I and II generally

mirror the statutory language of 42 U.S.C. § 2000e-2(a)(1) and (2), respectively, leaving some

uncertainty as to what cause(s) of action plaintiff asserts under those counts.  At oral argument on

December 17, 2008, plaintiff's counsel confirmed that plaintiff raises two Title VII claims:

hostile work environment and retaliation.  Counsel also confirmed that Count III makes out

plaintiff's claim for retaliation.  Counsel further stated that Count II makes out plaintiff's claim

for a hostile work environment and agreed to voluntarily dismiss Count I.  Therefore, based on

counsel's representations and upon agreement of the parties, the court will dismiss Count I

pursuant to Federal Rule of Civil Procedure 41(a)(2).

### 3.    Count III: Retaliation

Plaintiff raises a claim for retaliation in Count III of his complaint.  (Compl. ¶¶ 47-50.)

Specifically, plaintiff pleads that he suffered retaliation "for complaining about race

discrimination and harassment . . . ."  (*Id.* ¶ 48.)  The court finds that plaintiff has failed to

produce sufficient evidence indicating that he engaged in any conduct that Title VII protects from

retaliation.  Accordingly, plaintiff has failed to make out a case for retaliation, and Cummins is

19

entitled to summary judgment in its favor as to Count III.

Title VII protects individuals who engage in protected conduct from retaliation by their employers. Specifically, Title VII states that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Three elements comprise a prima facie case for retaliation. *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001). "[A] plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action." *Id.*

Regarding the first element of the prima facie case for retaliation, Title VII protects two types of employee conduct; "the anti-retaliation provision of Title VII protects those who *participate* in certain Title VII proceedings (the 'participation clause') and those who *oppose* discrimination made unlawful by Title VII (the 'opposition clause')." *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (quoting *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)) (emphasis added). Conduct constituting protected opposition to discrimination "can take the form of informal protests of discriminatory employment practices." *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (internal quotation and citations omitted).

In the present case, plaintiff alleges that he was assigned more onerous work and then fired in retaliation for having sent the November 8, 2006 e-mail to Robinson. In his deposition, plaintiff states that he complained about racial discrimination in this e-mail. (Pl.'s Dep. 152:18-

20

153:4.)  Plaintiff also testified that this e-mail constituted his *only* complaint of racial

discrimination.  (*Id.* 134:4-15.)[23]  Upon review of the e-mail, the text of which appears in Section

I of this memorandum, it is immediately apparent that the e-mail makes no reference whatsoever

to racial discrimination or racial harassment.  Rather, in the e-mail, plaintiff explains: (1) why he

had previously left work early, (2) why he had not informed Robinson that he would be leaving

early, (3) his frustration at being reprimanded for arriving late to work, (4) that he felt ill, and (5)

that he may decide to leave work early for a doctor's appointment with or without Robinson's

permission.  Nowhere in the e-mail does plaintiff express or imply anything about race.

Nowhere in the e-mail does plaintiff compare himself to similarly situated white employees.  In

sum, there is no evidence that the e-mail has anything to do with race.

       In order for an employee's opposition conduct to come within the protection of 42 U.S.C.

§ 2000e-3(a), the employee's conduct must oppose a practice made unlawful by Title VII.  *See*

*Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995).[24]  "A general complaint of

---

     [23] Plaintiff further confirmed that the November 8, 2006 e-mail represented his only
attempted complaint about racial discrimination in papers he filed with the court.  (Pl.'s Resp.
Opp'n Def.'s Mot. Dismiss at 19) ("[I]n or about the first week of November 2006, [plaintiff]
*finally* sent an e-mail to Defendant Robinson complaining about being exposed to racially
offensive movies and about being reprimanded for being late when similarly situated white
managers were not reprimanded.") (emphasis added).  In his response to defendants' motion for
summary judgment, plaintiff does not argue that he engaged in any other protected conduct.
Plaintiff's failure to argue that he engaged in any other protected conduct confirms the court's
conclusion, upon review of all documents submitted by the parties, that the record contains no
evidence of any other conduct that could even arguably be considered protected by Title VII.
Having reached this conclusion, the court analyzes whether plaintiff has made out a prima facie
case that Cummins violated Title VII by allegedly retaliating against him for sending the
November 8, 2006 e-mail.

     [24] The *Barber* court was applying the anti-retaliation provision of the Age Discrimination
in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").  The court, however, stated that the anti-
retaliation provision of the ADEA is "analogous" to that of Title VII.  *Id.* at 702.  The Third

unfair treatment does not translate into a charge of illegal [racial] discrimination." *Id.* at 702. Plaintiff's e-mail "does not explicitly or implicitly allege that [race] was the reason for the alleged unfairness." *Id.* There is simply no evidence from which a trier of fact could reasonably infer that plaintiff's November 8, 2006 e-mail constituted opposition to racial discrimination. As such, the e-mail cannot constitute opposition conduct protected by Title VII. Therefore, plaintiff has failed to make out the requisite first element of the prima facie case for retaliation, and his retaliation claim must fail. Having decided that plaintiff has not satisfied the first element of the prima facie case, the court need not discuss the remaining two elements.

Because plaintiff has failed to produce evidence sufficient to make out a prima facie case for retaliation, the court will grant summary judgment for Cummins (the only remaining defendant in this case) as to Count III.

### 4. Count II: Hostile Work Environment

Count II of plaintiff's complaint alleges violation of Title VII, specifically 42 U.S.C. § 2000e-2(a)(2). As discussed above, plaintiff's counsel has clarified that Count II makes out plaintiff's claim for a hostile work environment. The court concludes that a reasonable trier of fact could find that plaintiff was subjected to a hostile work environment. Furthermore, the court finds that there are genuine issues of material fact as to whether Cummins is protected from liability by an affirmative defense. Accordingly, Cummins is not entitled to judgment as a matter of law as to plaintiff's hostile work environment claim, and defendants' motion for summary

---

Circuit has more recently stated that "[t]he ADEA's provision against retaliatory discharge is *identical* to that of Title VII." *Slagle*, 435 F.3d at 266 (emphasis added). Thus, the court may appropriately apply the reasoning from *Barber* to the present case.

judgment will be denied as to Count II.[25]

To state a claim for a racially-based hostile work environment under Title VII, an employee-plaintiff:

> must show that: "(1) the employee suffered intentional discrimination because of [his race], (2) the discrimination was [severe or pervasive],[26] (3) the discrimination detrimentally affected the [employee], (4) the discrimination would detrimentally affect a reasonable person of the same [race] in that position, and (5) the existence of *respondeat superior* liability."

*Andreoli*, 482 F.3d at 643 (3d Cir. 2007) (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001); *see also Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (requiring these elements in the case of a racially-based hostile work environment claim premised, at least in part, on the conduct of supervisors).

The parties dispute the timing and context of Jay White's alleged statement regarding difficulties that plaintiff might face due to his race.  The parties also dispute the context in which Robinson played the aforementioned audio clips.  Taking plaintiff's version of the facts to be true, however, a reasonable tier of fact could find that plaintiff has satisfied the first element of

---

[25] As discussed above, the court finds that plaintiff was not fired in violation of Title VII's anti-retaliation provision.  At oral argument, plaintiff's counsel acknowledged that plaintiff does not allege he suffered constructive discharge by virtue of a hostile work environment.  Therefore, the remedies potentially available to plaintiff for his hostile work environment claim are limited.  At oral argument, plaintiff's counsel stated that plaintiff's remedies would likely be limited to damages for mental distress that plaintiff suffered while he was exposed to the allegedly hostile work environment.

[26] As the Third Circuit noted in *Jensen v. Potter*, under Supreme Court precedent the second element of a hostile work environment claim requires that the discrimination be "severe or pervasive," not "pervasive and regular" as had often been stated in other Third Circuit opinions.  435 F.3d 444, 449 (3d Cir. 2006), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006).  Accordingly, the court has altered the above quotation from *Andreoli* to properly list the elements of a hostile work environment claim.  *See Pennsylvania State Troopers v. Suders*, 542 U.S. 129, 133 (2004).

23

the prima facie case for a hostile work environment.  Especially given plaintiff's testimony that Robinson would sometimes queue the *Training Day* clip to sound "my nigga" as plaintiff would walk by, a trier of fact could find that the way in which the audio clips were played constituted intentional discrimination against plaintiff on the basis of his race.  This conclusion would be buttressed if a trier of fact were to believe plaintiff's version of the circumstances surrounding White's statement rather than defendants' version.

Next, given plaintiff's testimony about the frequency with which the audio clips were played, a reasonable trier of fact could find that the clips were played with sufficient pervasiveness to satisfy the second element.  It is true that plaintiff identified only two audio clips as racially offensive, but he also testified that each clip was played repeatedly.  Thus, a reasonable trier of fact could find the second element satisfied.[27]

Regarding detriment from allegedly hostile work environments, the Supreme Court has stated that "[s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) (internal citation omitted).  The Court further explained that "whether an environment is 'hostile' . . . can be determined only by looking at all the circumstances."  *Id.* at 23.  Factors to consider include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.*

---

[27] Moreover, plaintiff may satisfy the second element of a hostile work environment claim by demonstrating sufficient pervasiveness *or* severity.  Given the insidious history and common connotation of the "N-word," the court notes without deciding that there also may be a genuine issue of material fact as to whether defendants' alleged conduct was "severe."

Taking the plaintiff's deposition testimony to be true, a reasonable trier of fact could find that plaintiff was embarrassed or humiliated by the playing of the offending audio clips in the presence of other managers.  Moreover, Robinson's alleged repeated playing of "my nigga" as plaintiff would walk by goes to all of the factors listed by the Supreme Court in *Harris*.  Thus, a reasonable trier of fact could conclude that the third and fourth factors—subjective and objective detriment—are satisfied.

Finally, a plaintiff alleging a hostile work environment must establish the existence of *respondeat superior* liability.  In *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court announced rules for determining vicarious liability in employment discrimination cases.

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.  When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c).  The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, 524 U.S. at 807.  In evaluating the first element of the affirmative defense—preventive care by employers—courts may consider whether employers have established policies dealing with discrimination.  *Id.*  Regarding the second element—the reasonableness of the plaintiff's care in avoiding harm—"an unreasonable failure [by an employee] to use any complaint procedure provided by the employer . . . will normally suffice to satisfy the employer's burden."  *Id.* at 807-08.  "No affirmative defense is available, however,

when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.* at 808.

Thus, analysis of the vicarious liability element of a claim for a hostile work environment created by a supervisor depends on whether the hostile environment culminated in a tangible employment action.[28]  In the present case, the court finds that, regardless of whether the alleged hostile work environment culminated in a tangible employment action, summary judgment for defendants would be inappropriate.  Under *Ellerth* and *Faragher*, assuming, *arguendo*, that the alleged hostile work environment did culminate in a tangible employment action, Cummins would be foreclosed from asserting the *Ellerth/Faragher* affirmative defense because the alleged hostile environment was created by Robinson, plaintiff's supervisor.[29]  Vicarious liability would attach, satisfying the fifth element of a hostile work environment claim.

Alternatively, if the alleged hostile environment did not culminate in a tangible employment action, the court cannot find as a matter of law that defendants have established the second element of the *Ellerth/Faragher* affirmative defense.  Specifically, plaintiff testified that former Cummins employees Erbe and Nunez suffered retaliation after complaining about

---

[28] The court notes that plaintiff has asserted that he was fired solely as a matter of retaliation (and, implicitly, not as part of the alleged hostile work environment).  (Compl. ¶ 34 stating "*the* real reason for terminating the Plaintiff from his employment and discharging him from his employment was retaliatory." (emphasis added).)  By his own admission, then, plaintiff's termination can not serve as a tangible employment action for purposes of his hostile work environment claim.  *See also* footnote 25, above.  As explained in the following analysis, however, this point is not critical to the present decision because Cummins is not entitled to summary judgment on the hostile work environment claim, regardless of whether plaintiff suffered a tangible employment action.

[29] Because the presence or absence of a tangible employment action would not affect the court's present ruling, I need not presently determine whether the alleged hostile environment culminated in a tangible employment action.

Robinson. From this testimony, a trier of fact could conclude that plaintiff was not unreasonable in failing to take advantage of Cummins' internal reporting procedures, despite the fact that those procedures provided employees with a list of Cummins personnel with whom to lodge complaints in the event of discrimination by a supervisor. Thus, there is a genuine issue of material fact as to plaintiff's reasonableness in failing to use Cummins' internal procedures, and the court cannot hold as a matter of law that defendants have established the second element of the *Ellerth/Faragher* affirmative defense.[30] Therefore, regardless of whether the alleged hostile environment culminated in a tangible employment action, defendants are not entitled to summary judgment as to plaintiff's hostile work environment claim.

## III.    Conclusion

The parties agree that plaintiff's PHRA claims are untimely. The court will therefore dismiss Counts IV and V (misnumbered as Count VII). All of plaintiff's remaining claims arise under Title VII, which does not impose individual liability on supervising employees, so the court will grant defendants' motion for summary judgment as to Robinson and Casey. Plaintiff has failed to establish a prima facie case for retaliation because plaintiff has not submitted evidence indicating that he engaged in protected conduct. Accordingly, the court will grant the motion for summary judgment as to Count III. Count I will be voluntarily dismissed with the consent of the parties. Finally, because there are triable issues of fact regarding plaintiff's claim of a hostile work environment, the court will deny defendants' motion for summary judgment as to Count II. An appropriate order follows.

---

[30] Having reached this conclusion, the court need not discuss the first element of the *Ellerth/Faragher* affirmative defense at this time.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JOEL STILL, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 07-5235 |
| | : | |
| CUMMINS POWER SYSTEM, WILLIAM | : | |
| ROBINSON, and JOHN CASEY, | : | |
| Defendants. | : | |

## Order

**AND NOW** on this 8th day of January 2009, upon consideration of defendants' motion for summary judgment (Doc. No. 11), plaintiff's response, and defendant's reply thereto, **IT IS HEREBY ORDERED** that:

1. At the request of plaintiff and with the concurrence of defendants, Count I, alleging violation of 42 U.S.C. § 2000e-2(a)(1), is **DISMISSED** pursuant to Federal Rule of Civil Procedure 41(a)(2).

2. At the request of plaintiff and with the concurrence of defendants, Counts IV and V (misnumbered as Count VII), alleging claims under the Pennsylvania Human Relations Act, are **DISMISSED** pursuant to Federal Rule of Civil Procedure 41(a)(2).

3. Defendants' motion for summary judgment as to defendants William Robinson and John Casey is **GRANTED**, and judgment is **ENTERED** in favor of defendants William Robinson and John Casey and against plaintiff.

4.      Defendants' motion for summary judgment is **DENIED** as to Count II.

5.      Defendants' motion for summary judgment is **GRANTED** as to Count III.

Judgment is **ENTERED** in favor of Cummins Power System and against Joel

Still as to Count III.

s/ William H. Yohn Jr., Judge
William H. Yohn Jr., Judge